DONALD FUSCO, Plaintiff, *v.* DIVA C. FUSCO, Defendant.

Supreme Court, Equity Term, Onondaga County, October 12, 1951.

*Rocco Regitano* for plaintiff.

*William V. Laviano,* succeeded by *Warren V. Winkelstein,* for defendant.

SEARL, J.  This is an action for annulment of a ceremonial marriage in which defendant duly authorized Laviano & Rava, attorneys, of Queens County, New York, to appear and defend for her.  An answer was subsequently served admitting the residence of defendant and the marriage.  Otherwise it was a general denial.  On June 5, 1948, an order granted these attorneys $300 for counsel fees and expenses.  This was paid by plaintiff.  Later, Warren Winkelstein, of Syracuse, New York, was substituted as defendant's attorney.  Proceedings, including testimony by deposition, have continued until October 11, 1951, when the case was finally submitted.

The testimony presents a wartime saga.  Plaintiff, a native born citizen of the United States, went to Italy in 1937 to study medicine.  Shortly after the Kingdom of Italy declared war on the United States, December 10, 1941, plaintiff, then an

interne in a hospital in the city of Bologna, claims he was told by defendant and members of her family, whom he had met, that if he married an Italian national he would avoid being sent to a concentration camp. His testimony is that defendant was a member of the Fascist Union; that, of his associate student Americans, some were being sent to concentration camps and others married Italian nationals. According to plaintiff, defendant and members of her family told him that through their influence his release by the authorities could be obtained in event he married defendant. Following the ceremonial marriage on January 31, 1942, plaintiff was called by the authorities to serve in the military hospital at Bologna. Later, from April, 1945, after the liberation of Italy, until August, 1946, he was employed in the United States Claims Service, returning to the United States in August, 1946.

The plaintiff was born and brought up in Syracuse, attended Syracuse schools and the university. As to whether plaintiff consented to become an Italian citizen, he denied that he voluntarily gave such consent; that as late as 1945 he was put in jail because he was an enemy alien. He stated he was in Italy only to study medicine, intending at all times to return eventually to Syracuse. There are no children of the marriage. Plaintiff states he never voluntarily cohabited with defendant, who was several years his senior.

Much time was spent translating and interpreting Italian law. It is claimed that a royal decree of November 17, 1938, concerning provisions for the defense of the Italian race, in force and effect on the date of this marriage in 1942, prohibited the marriage of an Italian citizen with a person of foreign nationality. This is one of the reasons plaintiff urges the marriage was void.

Defendant sought to question the applicability of this royal decree and sought to elicit from a witness, who had been admitted to and practiced as a barrister in the Kingdom of Italy, his interpretation as to the meaning and import of this Italian statute. This court received the evidence subject to a reservation to later strike it out. Wigmore (Vol. 7, 3d ed., § 1953) discusses the question. The English rule is liberal in this respect (*Baron de Bode's Case,* 8 Q. B. [A. & E. N. S.] 208, 265; *Sussex Peerage Case,* 11 Cl. & Fin. 85, 115). What few American cases can be found are not in accord. In a somewhat recent New Jersey case (*Max* v. *Max,* 123 N. J. L. 580, 589 [1940]) the court received the testimony of a New York attorney relative to his opinion as to the meaning of a statute of the State of New York. The logical conclusion would be, it seems

to me, that a court could properly admit a witness to construe a foreign statute, provided the witness is properly qualified, to aid the court to the extent the court saw fit to accept such interpretation. In the instant case this court, therefore, denies plaintiff's motion to strike out the evidence, with an exception noted.

The story of the concentration camp, as revealed, with its mass murders and untold suffering has proven the worst blot on the history of modern civilization. If the plaintiff in this case was farsighted enough to visualize what was before him in event he were to be placed in such a demoniacal place of torture, one might properly forgive him for almost any means of avoidance. Though the court finds the predicament plaintiff found himself in insufficient to warrant an annulment, still the fact that plaintiff failed to produce, prior to the date of the ceremonial marriage, any certificate or declaration from a proper official of the United States Government, as required by the laws of Italy then in force, renders proper a judgment declaring the alleged ceremonial marriage null and void as of the date thereof. This conclusion comes from the following proof: An attorney, who had attended school in Italy, familiar with phraseology of the country, interpreted the provisions of the Italian Civil Code, originally enacted in 1852, revised in 1939, and in force at the time of this ceremonial marriage in January, 1942. Section 116 thereof, claimed to be applicable, provided: " A foreigner who desires to contract marriage in the Kingdom must present to the official of the Civil State a declaration from a competent authority of his own country from which it appears that according to the laws to which he is subjected there is no impediment to the marriage."

From the proof introduced I am convinced that no such declaration was obtained or presented. A state of war had existed between the United States and Italy for nearly two months before the date of the alleged ceremonial marriage. This would lend weight to a finding that no such declaration was obtained.

The argument is also presented that during the pendency of a state of war between two belligerent nations valid contracts cannot be made between citizens of the respective nations. To some extent this claim, relating to marriages, which are contracts, is substantiated by various Federal decisions, such as were applicable at the time of the Civil War between the States, namely *Prize Cases* (2 Black [U. S.] 635), in which it was held that the people of the two countries become immediately the

enemies of each other, by the mere force and effect of the war itself.

American Jurisprudence (Vol. 56, War, § 110) provides: " During a state of hostility the citizens of hostile states are incapable of contracting with each other without the license or permission of the government; without such permission no valid contract can be made ".

It may be urged that this rule applies only to commercial contracts and transactions. The language of Judge RAPALLO, writing for the court in *Woods* v. *Wilder* (43 N. Y. 164, 168), would not support such a conclusion: " This interdiction of intercourse involves, according to well settled rules, a prohibition against *every species of private contract* with the subject or citizen of the enemy." (Italics inserted.)

Defendant's motions for dismissal of the complaint, on which decision was reserved, are denied, with exceptions. All exhibits offered are received except where receipt thereof in evidence has heretofore been denied. Prepare findings and decree adjudging and declaring the ceremonial marriage void as of the date thereof.